```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------x
CHAUNCEY DILLON,

                          Petitioner,    07 Civ. 10728(GBD)(DFE)

        - against -                      REPORT AND RECOMMENDATION
                                         TO JUDGE DANIELS
SUPERINTENDENT JAMES T. CONWAY,

                          Respondent.
---------------------------------------x
```

DOUGLAS F. EATON, United States Magistrate Judge.

    Richard M. Langone, acting as attorney for Chauncey Dillon, filed this habeas petition challenging Dillon's conviction for felony murder and other crimes, after a 2004 jury trial in Supreme Court, New York County before Justice Bonnie Wittner. He also filed a Memorandum of Law, and an Appendix containing the briefs and appendix to the Appellate Division.

    On February 1, 2008, Assistant District Attorney Nicole Beder filed a motion for dismissal on the ground that the petition was filed one day too late. On February 11, Mr. Langone served an opposing affirmation, arguing that he filed the petition exactly on time, and, in the alternative, presenting reasons for equitable tolling.

    On February 21, 2008, Mr. Langone served a letter and enclosed a copy of a day-old decision involving equitable tolling in the context of deportation, *Aris v. Mukasey*, __ F.3d ___, 2008 WL 441800 (2d Cir. Feb. 20, 2008). On March 7, ADA Beder served a reply affirmation.

    I then received and considered a March 17 supplemental affirmation from Mr. Langone, a March 17 letter from ADA Beder, a March 18 letter from Mr. Langone, and a March 18 letter from ADA Michael S. Morgan. On March 20, I heard oral argument from Mr. Langone and ADA Morgan.

    For the reasons set forth below, I recommend that Judge Daniels grant the dismissal motion, based on the one-year statute of limitations and the strict case law on equitable tolling. (I have assumed the truth of all of the facts stated by Mr. Langone pertinent to equitable tolling.)

## BACKGROUND

At the trial, all of the evidence indicated as follows. On April 25, 2003, at about 3:15 a.m., Dillon was in a Dodge Intrepid being driven by John (Jaquan) Mingo. Also in the Intrepid were Mingo's girlfriend Shania Davis, and Reginald Glen and Herndon Williams. These five had just come from a nightclub, where they had been photographed for the club's website. On West 21st Street, the Intrepid struck the car ahead, a Jeep Cherokee in which Eric Mangrum (the deceased) was driving Ezekiel Jiles and two other men. The occupants of the two cars agreed to meet around the corner, on West 22nd Street.

On West 22nd Street, the occupants had an altercation. The jury saw photographs from surveillance cameras, which showed Mingo using one hand to grab Jiles's large necklace and using his other hand to point a pistol at Jiles. The jury heard testimony from Mingo's girlfriend Davis, and from the three surviving occupants of the Jeep (Jiles, Jamal Hamilton and Humberto Thornton). Mangrum was killed by gunshots which the prosecutor attributed to Mingo. Jiles was wounded by gunshots; some testimony suggested that those shots might have come from Dillon or from Williams.

Two days later, on April 27, 2003, Dillon was arrested in Brooklyn. He was indicted on May 9, 2003. On October 5, 2004, the jury found him guilty of attempted robbery of Jiles, criminal possession of a weapon (two counts), first-degree assault against Jiles, and felony murder of Mangrum. Dillon received an aggregate sentence of 30 years to life.

Petitioner's 11/30/08 Appendix contains the People's 4/19/06 brief, which states as follows. Williams was arrested on May 17, 2003, *id.* at 15; apparently he was released and then rearrested on October 12, 2005. He pleaded guilty to criminal facilitation and received a probation sentence. *Id.* at 3. As of April 2006, Glen had not been arrested in connection with this case. *Id.* at 3. Mingo was arrested on June 5, 2003. Indicted separately, he was found guilty at a separate jury trial. *Id.* at 3. He was sentenced to 25 years to life, *People v. Mingo*, 35 A.D.3d 237, 824 N.Y.S.2d 708 (1st Dep't 2006), *leave denied*, 8 N.Y.3d 948, 836 N.Y.S.2d 558 (2007), apparently consecutive to a sentence imposed in 2004 in Brooklyn, *People v. Mingo*, 37 A.D.3d 854, 830 N.Y.S.2d 524 (2d Dep't 2007), *aff'd*, 9 N.Y.3d 848, 840 N.Y.S.2d 774 (2007).

At trial, Dillon was represented by James M. McQueeney of the Legal Aid Society. On appeal, he was represented by retained

-2-

attorney Sanford N. Talkin.

The conviction was affirmed. *People v. Dillon*, 30 A.D.3d 1135, 815 N.Y.S.2d 574 (1st Dep't June 6, 2006), *leave denied*, 7 N.Y.3d 812, 822 N.Y.S.2d 487 (Aug. 31, 2006). Dillon did not apply to the U.S. Supreme Court for a writ of *certiorari*.

### **DISCUSSION**

28 U.S.C. §2244(d)(1) provides, in pertinent part:

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of - -
>
> > (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;   * * *

In *Pratt v. Greiner*, 306 F.3d 1190, 1195 (2d Cir. 2002), the Second Circuit wrote:

> .... Because the New York Court of Appeals denied Pratt's application for leave to appeal his conviction on July 16, 1997 [Day 197], his state court judgment became final, for purposes of §2244(d)(1), ninety days later on October 14, 1997 [Day 287]. Consequently, to be timely, his federal habeas petition was required to be filed one year later - - October 14, 1998 - - unless the period was tolled.

(Citation omitted, bracketed material added by me.) In footnote 1, the Second Circuit explained: "A conviction becomes final for purposes of 28 U.S.C. §2244(d) upon expiration of the ninety-day period to petition for a writ of *certiorari* to the United States Supreme Court. [citations omitted]."

Because the New York Court of Appeals denied Dillon's application for leave to appeal on August 31, 2006 [Day 243], his state court conviction became final ninety days later on November 29, 2006 [Day 333, a Wednesday]. Consequently, to be timely, his federal habeas petition was required to be filed one year later - - November 29, 2007 [a Thursday] - - unless the period was tolled. Mr. Langone filed it on November 30, 2007.

When a time limit is expressed as 90 days, or 60 days, or 30 days, it sometimes happens that non-lawyers, or lawyers, or judges will carelessly assume this means 3 months, or 2 months, or 1 month.  But Mr. Langone did not make that mistake.  His 2/11/08 affirmation annexes the "Table for Computation of Expiration Dates" from the 2006 New York Lawyers Diary and Manual, and he points out that it lists November 30, 2006 as the 90th day from September 1, 2006.  The question is why he measured from September 1 rather than August 31.

Mr. Langone writes:

> .... AEDPA's statute of limitations began to run "the day <u>after</u> the petitioner was denied leave to appeal" to the New York Court of Appeals.  *See Geraci v. Senkowski*, 23 F.Supp.[2d] 246, 253 (E.D.N.Y. 1998) [emphasis added by Mr. Langone] ....

In 1998, Mr. Langone was working as a paralegal for Geraci's attorney and therefore was aware of that decision by Judge Gleeson, who found the petition to be three days late (although he also proceeded to consider the merits).  The brief quotation has a far different meaning when we read it in its context.  Unlike Dillon, Geraci had made post-conviction motions before coming to federal court.  Therefore, Judge Gleeson had to construe the word "pending" in subdivision 2 of §2244(d).  He wrote (with my emphasis added):

> Based upon the foregoing, I conclude that, at least where the petitioner is represented by counsel in connection with his post-conviction motions and habeas petition, the dates on which the post-conviction motions are **filed** are **counted** towards statute of limitations, as is the date on which the habeas petition is filed, but the dates on which the relevant decisions with respect to the post-conviction motions are **rendered** are **not** [counted].
>
> Here, the statute of limitations began running on April 24, 1996, so the first day counted toward the limitations period is April 25, 1996.  The "clock" stopped running 283 days later, on February 1, 1997, the date the petitioner filed his §440 motion.
>
> The statute of limitations began running

> again on August 26, 1997, the day after the
> petitioner was denied leave to appeal **the
> Appellate Division's denial of his §440 motion,**
> and continued to run through November 11, 1997,
> the date the petitioner filed his *coram nobis*
> petition.

True, Judge Gleeson did not count August 25, 1997, but the reason was because Geraci's §440 motion was still "pending" at the start of that day; at a later point during that day, it was no longer "pending." (In the last sentence quoted above, Judge Gleeson made an immaterial mistake; as is clear from his page 251, he meant to say that Geraci "was denied leave to appeal to the Appellate Division from the trial court's denial of his §440 motion.") When Geraci's petition was filed in federal court, it was still an open question whether the word "pending" included the time during which the denial of leave had been traveling through the mail to Geraci's attorney. Yet the Second Circuit refused to grant equitable tolling to Geraci. *Geraci v. Senkowski*, 211 F.3d 6, 9 (2d Cir. 2000).

The *Geraci* opinions did not involve any issue about when the conviction became "final." That issue was discussed in *Pratt*, 306 F.3d at 1195, n.1: "A conviction becomes final for purposes of 28 U.S.C. §2244(d) upon expiration of the ninety-day period to petition for a writ of *certiorari* to the United States Supreme Court." This, of course, refers to U.S.Sup.Ct. Rule 13. Mr. Langone's 2/11/08 affirmation refers to Rule 13, but only to its first subdivision, where the second sentence provides: "A petition for a writ of certiorari seeking review of a judgment of a lower state court that is subject to discretionary review by the state court of last resort is timely when it is filed with the Clerk within 90 days after entry of the order denying discretionary review." Mr. Langone points to the word "after," and argues that this means that a petition for certiorari for Dillon would have been timely on November 30, 2006, which is 91 days after August 31, 2006. But that is an unreasonable reading of the phrase "within 90 days after entry." Moreover, the third subdivision of Rule 13 says (with my emphasis): "The time to file a petition for certiorari **runs from the date of entry** of the judgment or order sought to be reviewed ...."

Next, the 2/11/08 affirmation argues that Mr. Langone's method of calculation was supported by *Clay v. United States*, 537 U.S. 522, 525, 123 S.Ct. 1072, 1075 (2003). Not so. Clay's conviction was affirmed by the Seventh Circuit on November 23, 1998. The time in which he could have petitioned for certiorari expired 90 days later, which would have been February 21, 1999;

however, that date was a Sunday, so the Supreme Court's opinion correctly stated that the time expired on February 22.

In his 3/17/08 supplemental affirmation, Mr. Langone points to a Tenth Circuit dictum, although he does not claim that he was aware of it in 2007. *United States v. Hurst*, 322 F.3d 1256 (10th Cir. 2003), ruled that Hurst's §2255 motion was timely. In the major portion of the opinion, the Tenth Circuit overruled one of its prior decisions (an anomaly that had said that the one-year post-AEDPA grace period ended on April 23, 1997, one day before the anniversary date of AEDPA's enactment). But the last portion of the *Hurst* opinion created another anomaly; it began with two accurate sentences, but then it seemed to tack an extra day onto the one-year statute of limitations. The last portion said:

> This court denied the petition for rehearing submitted in [Mr. Hurst's] direct appeal on February 16, 1999 [Day 47]. He therefore had ninety days, or until May 17, 1999 [Day 137, a Monday], to file a petition for certiorari with the United States Supreme Court. Because Mr. Hurst did not seek Supreme Court review, the one-year period of limitations applicable to his §2255 motion commenced on the day after expiration of the time for petitioning for certiorari, or May 18, 1999.
>
> Under the anniversary rule we have adopted, the one-year period ended on May 18, 2000, even though the year 2000 was a leap year. Mr. Hurst's §2255 motion was submitted to the clerk on May 17, 2000. Consequently, the motion was filed within the AEDPA statute of limitations, with a day to spare.

*Hurst*, 322 F.3d at 1261-62. In my view, Hurst's §2255 motion was filed exactly on time, with no day to spare. It is unclear whether the Tenth Circuit intended to make an unnecessary holding to the effect that the well-accepted "anniversary" rule actually means one year plus one day. (In the Tenth Circuit, does every husband who forgets his wedding anniversary receive a one-day grace period?) In an unpublished opinion, the Second Circuit avoided considering whether to adopt *Hurst*'s anomalous computation. *Claudio v. Portuondo*, 74 Fed. Appx. 120, 121 (2d Cir. 2003). However, in a 2005 published opinion, the Second Circuit set forth the type of computation seen everywhere except the Tenth Circuit:

> Fernandez's conviction was unanimously affirmed by the Appellate Division, First Department, *People v. Fernandez,* 249 A.D.2d 3, 670 N.Y.S.2d 840, 843 (1st Dept. 1998), and the New York Court of Appeals denied leave to appeal, *People v. Fernandez,* 92 N.Y.2d 897, 680 N.Y.S.2d 60, 702 N.E.2d 845 ([August 18,] 1998 [Day 230]). The conviction became final 90 days thereafter - - *i.e.,* after the period in which a litigant can petition for a writ of certiorari from the United States Supreme Court – - which was November 16, 1998 [Day 320]. Absent a "properly filed" state application for collateral review, the AEDPA one-year statute of limitations was set to expire on November 16, 1999.

*Fernandez v. Artuz*, 402 F.3d 111, 112 (2d Cir. 2005) (material in brackets added by me).

I now turn to the doctrine of equitable tolling. In *Pace v. DiGuglielmo*, 544 U.S. 408, 418, 125 S.Ct. 1807, 1814 (2005), the Supreme Court assumed, without deciding, that equitable tolling is applicable to AEDPA's statute of limitations. It then said: "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." More recently, Judge Leval summarized the Second Circuit's position as follows:

> We have held that "in rare and exceptional circumstances a petitioner may invoke the courts' power to equitably toll the limitations period." *Doe v. Menefee*, 391 F.3d 147, 159 (2d Cir. 2004) (quotation marks omitted). "To qualify for such treatment, the petitioner must establish that extraordinary circumstances prevented him from filing his petition on time, and that he acted with reasonable diligence throughout the period he seeks to toll." *Id.* (quotation marks omitted).

*Belot v. Burge*, 490 F.3d 201, 205 (2d Cir. 2007). It appears to me that both Dillon and Mr. Langone acted with reasonable diligence. However, I find that Dillon has failed to establish the other essential element, "that extraordinary circumstances prevented him from filing his petition on time."

I acknowledge that the chronology provided by Mr. Langone is

-7-

heartbreaking, and I shall now summarize it in some detail.

It appears that Dillon had an inmate legal assistant helping him to prepare a *pro se* habeas petition, and that he could and would have filed one before November 2007 except that he retained Mr. Langone in or about August 2007.  However, the same thing could be said by almost every prisoner who has ever chosen to retain an attorney.  In *Coleman v. Thompson*, 501 U.S. 722, 111 S.Ct. 2546 (1991), the Supreme Court wrote:

> .... There is no constitutional right to an attorney in state post-conviction proceedings. .... Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings.

*Coleman*, 501 U.S. at 752.  The same is true in federal habeas proceedings.  In both types of proceedings, "the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must 'bear the risk of attorney error.'"  *Id*. at 753.

I have found only one Second Circuit decision that found "extraordinary circumstances" in favor of a petitioner who sought equitable tolling in a §2254 or §2255 case.  In a §2255 case, *Baldayaque v. United States*, 338 F.3d 145, 152-53 (2d Cir. 2003), Judge Meskill wrote for himself and Judge Feinberg:  "[W]e hold that an attorney's conduct, if it is sufficiently egregious, may constitute the sort of 'extraordinary circumstances' that would justify the application of equitable tolling to the one-year limitations period of AEDPA."  They distinguished *Geraci*, 211 F.3d at 9, and *Smaldone v. Senkowski*, 273 F.3d 133, 138-39 (2d Cir. 2001) as follows:

> .... The attorneys in *Smaldone* and *Geraci* made simple mistakes about the rules applied to the deadlines for filing habeas petitions.  Such mistakes are ordinary.  Weinstein's actions, taken together, were extraordinary.
>
> In spite of being specifically directed by his client's [Baldayaque's] representatives to file a "2255," Weinstein failed to file such a petition **at all**.  ....
>
> Weinstein did no legal research on Baldayaque's case.  ....

> Weinstein never spoke to or met with Baldayaque. When his letter to Baldayaque was returned, Weinstein made no effort to locate Baldayaque. ....

*Baldayaque*, 338 F.3d at 152 (emphasis added). In a concurring opinion, Judge Jacobs wrote that those facts formed "an evidentiary basis for concluding that the petitioner's lawyer was not acting as agent." *Id.* at 154. Judge Jacobs would have entertained the agency argument even though it had not been raised in the district court. *Id.* at 155. He noted the agency rationale in *Coleman*, which leads to the rule that "it is the petitioner (as principal) who has defaulted when the attorney fails to act on time." *Id.* at 154. On the other hand: "The corollary to this rule is that when an agent acts in a manner completely adverse to the principal's interest, the principal is not charged with the agent's misdeeds." *Ibid.* (internal quotations marks, brackets, and citation omitted).

An equally faithless attorney was the subject of *Cartagena v. Corcoran*, 2008 WL 630064, *5 (E.D.N.Y. Mar. 3, 2008). The attorney failed to file any habeas petition at all, and Judge Seybert granted equitable tolling; she noted: "Harmel failed to inform Petitioner that the paralegal in his office who handled habeas petitions had been arrested, that Petitioner's file had been lost, or that Harmel was suffering from a series of debilitating ailments that left him unable to practice law."

The facts in *Baldayaque* and *Cartagena* were utterly different from those in the case at bar.

In or about August 2007, Dillon retained Mr. Langone to prepare both a federal habeas petition and a state coram nobis petition, with both to be filed on the same day.

Mr. Langone's law partner unexpectedly left to work as a corporate counsel, and Mr. Langone had to work alone on approximately 20 active cases. As a result, he was unable to commence work on Mr. Dillon's case until mid-October 2007.

On November 13, 2007, Mr. Langone flew from Long Island and visited Dillon in Attica State Prison. He brought the 16-page petition on federal form AO241, and Dillon signed it in front of a notary. It is now Document #1 in our Court file, but it was not filed until November 30, 2007. Mr. Langone's 2/11/08 affirmation, at ¶10, states:

> During our visit, Mr. Dillon and I spoke about AEDPA's limitation on time to file his

>     habeas corpus petition, and he specifically
>     <u>asked me</u> not to wait until the last day to file
>     the petition.  I told him that I would not wait
>     until the last day to file the petition.  ....
>     On November 13, 2007, I left Attica prison with
>     his verified petition in my hand and with him
>     <u>expecting</u> that I would file it with this Court
>     <u>before</u> November 30th, the date I believed was
>     the last day to file the petition.

Mr. Langone spent the next 17 days writing the coram nobis petition and a highly polished, 51-page Memorandum of Law in support of the habeas petition.  Moreover, from approximately October until a few days before November 30, 2007, he spent time tracking down a copy of the videotape that had been seen by the jury.  He writes:  "Mr. Dillon believed that the video would demonstrate to this Court that he was not involved in the fight that led to the shooting, and that he was not in possession of a gun during the altercation on the night of the incident.  He requested that I watch the videotape so that I might make use of it in the habeas corpus petition.  ....  I first contacted the Legal Aid Society (LAS), who represented Mr. Dillon at trial, ....  After about two weeks, LAS sent me the wrong videotape ....  I next contacted Mr. Dillon's original appellate attorney ....  I received the videotape from him just a few days prior to November 30, 2007.  Unfortunately, [it turned out that] the videotape was too dark to identify the persons who fired the guns.  I have retained a professional video enhancing service to try to enhance the quality of the tape."  (2/11/07 Langone aff., at ¶8 and n.2.)

On November 30, 2007, Mr. Langone personally drove from Long Island to Manhattan to file the petition, Memorandum of Law, and Appendix.  (2/21/08 Langone letter, pp. 1-2.)

In short, Mr. Langone worked diligently for Dillon.  Dillon wanted both speed and thoroughness, as many clients do.  He wanted the petition to be filed in advance of the deadline, but he also requested Mr. Langone to track down the videotape and to see whether it would provide an additional argument to put in the petition.

If Mr. Langone had calculated the deadline correctly, it is obvious that he would have come to the courthouse on November 29, 2007, and filed (a) the form petition that Dillon had signed on November 13, and (b) the Memorandum of Law in a somewhat less polished form.  But a case on point is *Sandvik v. United States*, 177 F.3d 1269 (11th Cir. 1999), cited with approval by the Second Circuit in *Smaldone*, 273 F.3d at 138.  Sandvik's §2255 motion was

fully prepared in final form; it was due in the Miami courthouse on April 24, 1997; Sandvik's attorney mailed it from her Atlanta office on Thursday, April 18, 1997.  The court clerk in Miami file-stamped it on April 25, 1997 - - one day late.  *Id.* at 1270.  The Eleventh Circuit concluded:  "While the inefficiencies of the United States Postal Service may be a circumstance beyond Sandvik's control, the problem was one that Sandvik's counsel could have avoided by mailing the petition earlier or by using a private delivery service or even a private courier.  There is not, therefore, ground for equitable tolling here."  *Id.* at 1272.

    Mr. Langone cites the recent decision of *Aris v. Mukasey*, ___ F.3d ____, 2008 WL 441800 (2d Cir. Feb. 20, 2008), where Judge Katzmann wrote:

> ....  We have previously indicated that ineffective assistance of counsel can constitute an "exceptional circumstance" warranting the reopening of a deportation order entered *in absentia*. ....  We write today to establish what we would have thought self-evident:  A lawyer who misadvises his client concerning the date of an immigration hearing and then fails to inform the client of the deportation order entered *in absentia* ... has provided ineffective assistance.
>
>     \*    \*    \*
>
> ....  While binding Second Circuit precedent holds that aliens in deportation proceedings have "no specific right to counsel," the Fifth Amendment does require that such proceedings comport with due process of the law.

*Aris*, at \*1, \*4.  (The phrase "equitable tolling" appears at n.7.)  In deportation proceedings, the primary due process concerns are:  (1) the right to appear at a hearing before an Immigration Judge, and (2) the right to judicial review of the Immigration Judge's ruling.  In §2254 and §2255 cases, the prisoner has already received a considerable amount of due process:  (1) the right to a trial, and (2) the right to a direct appeal.  Moreover, in §2254 cases there is the additional factor of State sovereignty.  Respect for State sovereignty has led to increasing restrictions on the power of a district judge to overturn a decision of a state appellate court, including Congress's 1996 enactment of a statute of limitations.  Therefore, in my view, *Aris* does not undermine the decisions in

§2254 cases such as the Supreme Court's decision in *Coleman* and the Second Circuit's decisions in *Geraci* and *Smaldone*.

Finally, I turn to ¶15 of Mr. Langone's 2/11/08 affirmation, which says: "Petitioner is entitled to equitable tolling by one day based also on the 'actual innocence exception' to AEDPA's statute of limitations. *See House v. Bell*, 547 U.S. 518, 126 S.Ct. 2064 (2006)." In that case, "the Tennessee Supreme Court [had] held that House's claims were barred under a state statute providing that claims not raised in prior postconviction proceedings are presumptively waived." 547 U.S. at 534. At the same page, the U.S. Supreme Court stated that the issue before it was whether House had presented enough new evidence to fall within the "actual innocence" exception to procedural default, an exception that was established in *Schlup v. Delo*, 513 U.S. 298, 115 S.Ct. 851 (1995). For that exception, *Schlup* requires an extremely strong showing of actual innocence; the prisoner must produce "new reliable evidence" and "must show that it is more likely than not that **no** reasonable juror would have convicted him in the light of the new evidence." 513 U.S. at 324, 327 (emphasis added). I am willing to assume that the same showing would also excuse the late filing of a §2254 petition, but I note that the Second Circuit has specifically reserved decision on that question. *Doe v. Menefee*, 391 F.3d 147, 160 (2d Cir. 2004).

Dillon has not presented any new evidence. Mr. Langone points to his Memorandum of Law in support of the petition. I have reviewed it, but it does not establish "actual innocence."

Point I concerns the summation comments about the testimony of Detective Mark Murphy, who questioned Dillon when he was arrested two days after the shooting. Dillon was affable and cooperative during the questioning, but he often answered "No comment." For example, the detective showed him a photograph of a watch that was found at the crime scene, and asked if he owned a watch like this; Dillon said yes. When asked where his watch was, Dillon said, "No comment." (11/20/07 Memo. of Law, pp. 22-23.) On summation, the prosecutor referred to that testimony, and then said: "And Detective Murphy is sitting down saying I'm prepared to listen and the defendant slams the door in his face. He doesn't say anything about him being at the scene and not participating." (*Id.*, p. 24, quoting Tr. 574-75.) Defense counsel objected and the court instructed the jury that while "every defendant has a right not to make a statement or to remain silent ..., both sides can comment on any statements that were made and then you [the jury] can draw your own inferences from those statements." (*Ibid*, quoting Tr. 576.) The First Department ruled:

>     Since defendant chose to make a statement
> to the police, the prosecutor was entitled to
> make appropriate reference in summation to the
> context of the statement, and his remarks did
> not constitute an improper comment on defendant's
> exercise of the right to remain silent.  In any
> event, the court's instruction to the jury was
> sufficient to prevent any prejudice.

*People v. Dillon*, 30 A.D.3d 1135, 815 N.Y.S.2d 574.

On federal habeas, Dillon must show that the First Department's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. §2254(d)(1).  The 11/30/07 Memorandum of Law, at pages 28-29, points to *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229 (1965), where the defendant did not testify at the trial but did testify at the penalty phase.  Yet Mr. Langone acknowledges that the *Griffin* trial court instructed the jury that the failure of Griffin to testify at the trial was a factor the jury could consider "as tending to indicate the truth of [the incriminating] evidence [presented at the trial] and as indicating that among the inferences that may be reasonably drawn therefrom those unfavorable to the defendant are the more probable."

Point II stems from a written statement that was given to the police by Mingo's girlfriend Shania Davis (apparently on August 5, 2003, two months after Mingo was arrested).  It appears to be undisputed that her statement gave an account of the entire incident, stating that she, Mingo, Dillon, and the other two left the scene in their car, and in the car Dillon said "I shot one of the guys in the Jeep," and a few days later Mingo said that he had shot one of the guys and that Dillon had shot the other guy.  At the trial of Dillon, the prosecution called Davis to the stand.  She testified to a lack of recollection; when shown her signed statement, she testified that it did not refresh her recollection.  The judge declared that Davis was a hostile witness.  (11/30/07 Memo. of Law, pp. 35-38.)

At page 34, the Memorandum says:  "While the proper use of the statement was merely to use it to impeach Ms. Davis' purportedly inconsistent trial testimony, the trial prosecutor used it for the entirely improper purpose of revealing to the jury every detail in the statement that incriminated petitioner."  Point II does not complain about the statement's quotation of Dillon, but rather about its quotation of Mingo, who was unavailable for cross-examination and had a motive to make

"partially exculpatory statements."  At page 45, the Memorandum acknowledges that "the Supreme Court has recently ruled that in order to have a confrontation clause violation, there must be state action.  *Davis v. Washington*, 126 S.Ct. 2266 (2006)."  But page 45 continues:

> Nevertheless, even before *Davis*, it was well settled by the Supreme Court in *Ohio v. Roberts*, 448 U.S. 56 (1980), and its progeny that the Due Process Clause of the Fourteenth Amendment prohibits the introduction into evidence of a non-state sponsored hearsay statement implicating a defendant in a crime unless the circumstances in which the hearsay statement was made contain strong "indicia of reliability."  *Roberts*, at 67; ....

In any event, page 42 acknowledges that Justice Wittner instructed the jurors to strike from their minds:

> any written statement [Ms. Davis] allegedly made, and any conversations which may or may not have occurred in the car between any of the participants in the car after the incident was over.  You are to also disregard and strike from your minds, if you remember, any statements which may or may not have been made out of court by Mr. Jacquan Mingo to Ms. Davis.  It's stricken from the record as if it never happened, and disregard it.

On Dillon's direct appeal, the First Department said:  "The court properly exercised its discretion in denying defendant's mistrial motion based upon testimony that allegedly violated CPL 60.35, since the court provided an adequate remedy by striking the testimony and delivering thorough curative instructions during the trial and again at its conclusion ...."  30 A.D.3d 1135.

Point III alleges, at page 48, that the prosecutor's summation "defied the trial court's order ... by referring to Ms. Davis' stricken testimony during which it was repeatedly revealed that John Mingo had implicated petitioner in the crimes charged."  However, the prosecutor's actual words were quoted in Mr. Talkin's 11/7/05 brief at page 26, which shows that the prosecutor was referring to a non-stricken portion of Davis's testimony:  "When the police come to her door she says, all right, all right.  I was there and ... this is what happened." (T. 574)  Point III also alleges that the summation "vouched for the credibility of the police witnesses."  The same point was

made by Mr. Talkin but his brief, at pages 26-27, conceded that "no objection was made" to that portion of the summation.

## CONCLUSION AND RECOMMENDATION

For the reasons set forth above, I recommend that Judge Daniels grant Respondent's motion and dismiss Dillon's habeas petition, based on the one-year statute of limitations and the strict case law on equitable tolling.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, any party may object to this recommendation within 10 business days after being served with a copy (i.e. **by April 16, 2008,**) by filing written objections with the Clerk of the U.S. District Court and mailing copies (a) to the opposing party, (b) to the Hon. George B. Daniels, U.S.D.J. at Room 630, 500 Pearl Street, New York, NY 10007 and (c) to me at Room 1360, 500 Pearl Street. Failure to file objections within 10 business days will preclude appellate review. *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), and 6(e). Any request for an extension of time must be addressed to Judge Daniels.

_____
DOUGLAS F. EATON
United States Magistrate Judge
500 Pearl Street, Room 1360
New York, New York 10007
Telephone: (212) 805-6175
Fax: (212) 805-6181fax

Dated:   New York, New York
         April 2, 2008

Copies of this Report and Recommendation are being sent by fax and by electronic filing to:

Richard M. Langone, Esq. at fax 516-795-2400fax

Nicole Beder, Esq. and Michael S. Morgan, Esq.
    New York County District Attorney's Office
    at fax 212-335-9288fax

Hon. George B. Daniels

-15-