USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12-22-15

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**CHAUNCEY DILLON,**

      **Petitioner,**

   - against -

**SUPERINTENDENT JOSEPH T. SMITH,**

      **Respondent.**

:
:
:
:
:
:
:
:
:
:

**REPORT AND**
**RECOMMENDATION**

**07-CV-10728 (ALC)(RLE)**

To the **HONORABLE ANDREW L. CARTER, JR., U.S.D.J.:**

### I.   INTRODUCTION

Petitioner Chauncey Dillon ("Dillon") seeks a writ of habeas corpus under 28 U.S.C. § 2254, challenging his December 17, 2004 conviction in New York Supreme Court, New York County. Dillon was convicted of murder in the second degree (N.Y. Penal Law ("N.Y.P.L.") § 125.25(3)), assault in the first degree (N.Y.P.L. § 120.10(4)), attempted robbery in the first degree (N.Y.P.L. § 110.00, 160.15(2)), two counts of criminal possession of a weapon in the second degree (N.Y.P.L. § 265.03(2)), two counts of criminal possession of a weapon in the third degree (N.Y.P.L. § 265.02(4)), and reckless endangerment in the first degree (N.Y.P.L. § 120.25). Dillon was sentenced to a term of thirty years to life in prison and is currently incarcerated in Shawangunk Correctional Facility in Wallkill, New York. (Doc. No. 52.)

In his Amended Petition for Writ of Habeas Corpus ("Amended Petition"), Dillon raises the following challenges to his conviction: 1) the trial court violated his Fifth Amendment rights by admitting testimony that Dillon said "no comment" in response to questioning while in police custody, and by permitting the prosecution to argue on summation that Dillon's silence was evidence of guilt; 2) the trial court violated Dillon's rights to Due Process and a fundamentally

fair trial by permitting hearsay testimony, which implicated him; 3) the cumulative effect of pervasive prosecutorial misconduct deprived Dillon of a fundamentally fair trial; 4) the prosecution violated Dillon's rights of confrontation and Due Process by referencing hearsay testimony implicating him in the charged offenses; and 5) defense counsel deprived Dillon of his Sixth Amendment right to effective assistance of counsel.  Dillon also raises a claim that defense counsel deprived him of his Sixth Amendment right to effective assistance of appellate counsel by failing: 1) to argue that Dillon's trial counsel was ineffective; 2) to argue that the evidence was factually and legally insufficient; and 3) to ask the Appellate Division to decide in the interest of justice whether a circumstantial evidence instruction was required.  (Doc. No. 39.)

For the reasons set below, I recommend that the petition be **DENIED**.

## II.      BACKGROUND

### A. Factual Background

At approximately 11:00 p.m. on April 24, 2003, John Mingo ("Mingo") and Herndon Williams ("Williams") picked up Mingo's girlfriend, Shania Davis ("Davis"), at her home in the Bronx.  (Trial Transcript ("Tr.") at 40-41, 78.)  Later that evening, the three met Dillon and Reginald Glen ("Glen") at a nightclub in Manhattan, where Dillon was photographed wearing a green flight jacket with an orange lining and a watch with a blue and yellow band.  (Tr. at 42-47, 49, 511-12.)  After approximately an hour and a half, the group left and made their way to another club on West 21st Street between Fifth and Sixth Avenues.  (Tr. at 49.)

Early on the morning of April 25, Eric Mangrum ("Mangrum") was driving a Jeep Cherokee westbound on West 21st Street between Fifth and Sixth Avenues.  (Tr. at 255.)  Mangrum and his passengers — Ezekiel Jiles ("Jiles"), Jamal Hamilton ("Hamilton"), and Humberto Thornton ("Thornton") — were also on their way to a club.  (Tr. at 254-55.)  The Jeep

2

occupants all had been drinking alcohol. (Tr. at 314.) Jiles had drunk a bottle of Crystal champagne and there was also a bottle of vodka being shared in the Jeep. (Tr. at 315.) Mingo, driving a Dodge Intrepid, struck the Jeep from behind. (Tr. at 49, 256.) Jiles got out to inspect the damage and determined that it was not serious. (Tr. at 256-57.) Mingo suggested that they drive around the corner to West 22nd Street to avoid the attention of the police. (Tr. at 50-51, 257-58, 401.) Mangrum and Hamilton drove the Jeep around the corner to meet the others. (Tr. at 261.) Jiles and Thornton walked. (Tr. at 52, 244-46, 258-59, 401.)

When Jiles asked who had the money to repair the damage to the Jeep (Tr. at 259), he and Mingo began to argue. (Tr. at 54.) Mingo drew a semi-automatic pistol, pointed it at Jiles, and reached for a platinum medallion that hung from Jiles's neck. (Tr. at 263, 597.) Jiles grabbed Mingo's right wrist and pushed the gun downward. (Tr. 263-64, 266-68.) Mingo began to fire, and Jiles placed him in a "full nelson," by pulling Mingo's arms behind his head and forcing Mingo's hands into the air. (Tr. at 268.) Jiles then pulled Mingo in front of him in an attempt to shield himself from gunfire that was coming from a second, unidentified shooter. (Tr. at 270, 278.) Jiles was shot once in his left side. (Tr. at 272.)

Before he was shot, Jiles saw at least two of the other men from the Dodge reach for their waistbands. He thought they were reaching for guns but did not see if they actually had weapons (Tr. at 270, 279.) Jiles saw one man reach for his waistband and recalled that the man wore green clothing. (Tr. at 272.) Hamilton saw a man wearing a brown-checkered shirt that resembled a "table cloth" pull out a gun and point it at Mangrum. (Tr. at 280-82, 284, 345, 357, 375, 377.) He also remembered that there was a man wearing a jacket down the street. (Tr. at 383-84.) A man wearing a powder blue velour suit grabbed Hamilton by his shirt. (Tr. at 376.) Hamilton broke free, fled across the street, and heard gunshots. (Tr. at 345, 376-77.) He and

3

Thornton then ran to a nearby parking garage, where Hamilton asked a security guard to call the police. (Tr. at 358-63; 409-12.) Thornton saw a third man holding a gun but could not identify him. (Tr. at 406-07, 425.)

Surveillance footage showed Mangrum clutching his chest while fleeing east on the north sidewalk of West 22nd Street towards the garage. (Tr. at 412-14, 598.) Mangrum then turned and ran back to assist Jiles, who was now struggling with two individuals, one wearing a light-colored garment and the other wearing a dark jacket. (*Id.*) Jiles felt someone remove the chain from his neck and throw it on the street. (Tr. at 293.) He saw a "flash" of green as he was struck in the face with the butt of a gun and propelled onto the hood of the Dodge Intrepid. (Tr. at 296-97.)

Meanwhile, Glen returned to the Dodge, and began to drive east on West 22nd Street. (Doc. No. 31 at 9.) Surveillance video of the incident showed someone in dark clothing pushing Jiles over a pile of garbage bags onto the north sidewalk. (Tr. at 307-11.) The Dodge accelerated and struck the person in dark clothing, who then fell face-down on the car's hood. (Doc. No. 31 at 10.) Jiles tried to stand and saw an individual approaching him. As Jiles attempted to escape, Glen drove through the pile of garbage bags, struck Jiles, and threw him into the side of a building, causing him to lose consciousness. (Tr. at 297-99.) The Dodge struck the building, and Davis, who was still in the passenger seat, hit her head on the windshield and passed out. (Tr. at 63-64, 82.) Glen backed the Dodge into the street and allowed the three remaining passengers, including the person in dark clothing, to get back in the car before speeding east on West 22nd Street away from the scene. (Tr. at 416-17.)

When Jiles regained consciousness, he had his chain in one hand and an empty gun in the other. (Tr. at 302.) Neither Jiles nor his friends had been carrying guns. (Tr. at 305.) Jiles

4

abandoned the gun in a nearby dumpster and found Mangrum lying in the street. (Tr. at 302-03.)
Mangrum had been shot five times. (Tr. at 168-78.) Thornton joined Jiles to help Mangrum.
(Tr. at 417-19.)

At approximately 3:30 a.m., Sergeant Jeffrey Remus and Police Officer Derrick Moyer
were sitting in their patrol car on West 21st Street when they heard loud noises and a radio call
that reported shots fired on West 22nd Street. (Tr. at 188-89, 195, 213-14.) On West 22nd
Street near Sixth Avenue, the officers found Mangrum, lying on the ground, and Jiles, kneeling
near Mangrum and bleeding from a gunshot wound. (Tr. at 190-91, 206, 215.) Jiles and
Mangrum were taken to St. Vincent's Hospital, where Mangrum underwent emergency surgery
and Jiles was treated for a gunshot wound to the abdomen. (Tr. at 192, 216-17.) Mangrum died
approximately three hours later. (*Id.*)

Detective Matthew Steiner and officers from the Crime Scene Unit arrived at the scene of
the incident at approximately 4:40 a.m. (Tr. at 113-14.) Detective Steiner recovered a 9-
millimeter ("mm") semi-automatic pistol from the dumpster. The gun's magazine, which
contained four rounds of ammunition, was in the street. Also in the street were a deformed lead
bullet, six .40-caliber shell casings, two 9-mm rounds of ammunition, a .40-caliber round of
ammunition, three deformed, copper-jacketed bullets, two 9-mm discharged shell casings, and a
deformed lead bullet fragment. (Tr. 136-41.)

Detective Dillia Camacho concluded that the 9-mm pistol and ammunition were operable.
(Doc. No. 31 at 13.) Detective Peter Liota determined that the two 9-mm shell casings and one
of the deformed bullets were fired from the 9-mm pistol (*id*; Tr. at 447-48), and that the .40-
caliber shell casings all came from the same .40-caliber weapon. (Tr. at 450.) He concluded that
at least two guns had been involved in the shooting. (Doc. No. 31 at 13.) Detective Steiner also

recovered a watch with a blue and yellow band and a multicolored face, similar to the watch Dillon had been photographed wearing the night of the incident. (Tr. 140.)

On April 27, 2003, Detectives Britt and Rocco saw Dillon in Brooklyn, and contacted the Emergency Services Unit (E.S.U.), which arrived to arrest Dillon. (Tr. at 465.) Britt and Rocco then drove Dillon to the Thirteenth Precinct and placed him in the custody of Detective Murphy. (Tr. at 468, 483-84.) Police executed a search warrant at Dillon's residence and recovered a green flight jacket with an orange lining. (Tr. at 493-94.) On May 17, 2003, Murphy arrested Williams and, pursuant to a search warrant, recovered a brown and white-checkered shirt from his home. (Tr. at 501-04.) On June 5, 2003, the police arrested Mingo. (*Id.*)

## B.  Trial Proceedings

### 1.  *Huntley* Hearing

On September 22, 2004, the trial court held a *Huntley* hearing (*see People v. Huntley*, 15 N.Y.2d 72 (1965)) to resolve Dillon's motion to suppress statements he made while in custody. Detective Murphy was the People's only witness. According to Detective Murphy, Dillon indicated that he understood his rights, but refused to sign the form acknowledging that he had been read his rights. (Huntley Hearing Transcript ("H.") at 13-17.) Defense counsel argued that Dillon's statements should be suppressed because Murphy did not elicit an affirmative waiver of Dillon's *Miranda* rights. (*Id.* at 32-33.) The court found that there was probable cause for Dillon's arrest, and that Dillon, having been properly advised of his *Miranda* rights, knowingly and voluntarily waived those rights. (*Id.* at 34-35.) The court concluded that the police were not required to cease questioning because Dillon had failed to unequivocally invoke his rights to remain silent or to have an attorney present, and denied the motion to suppress. (*Id.* at 36.)

## 2.  Trial Testimony

The trial began on September 27, 2004, before the Honorable Bonnie Wittner in the Supreme Court of the State of New York, New York County.

### a.  Detective Mark Murphy

At approximately 8:00 p.m. on April 27, 2003, Dillon was placed in the custody of Detective Mark Murphy at the Thirteenth Precinct.  (Tr. at 483-84.)  Murphy took Dillon to an interview room and removed his handcuffs.  (*Id.* at 484.)  Murphy advised Dillon of his *Miranda* rights, and Dillon responded that he understood but did not sign the acknowledgement document. (Tr. at 484-87.)  Murphy asked Dillon whether he was willing to answer questions, and Dillon answered, "I want a doctor."  (*Id.* at 487.)  When Murphy asked Dillon why he wanted a doctor, Dillon said that he had hurt his leg when E.S.U. officers tackled him during his arrest.  (*Id.*) Murphy asked Dillon to lower his pants so he could see the injury, and Dillon complied.  (*Id.*) Murphy could not detect an injury.  (*Id.* at 487-88.)

Continuing the interview, Murphy told Dillon that he was investigating a car accident on West 20th Street between Fifth and Sixth Avenues to see if Dillon would correct the location. (Tr. at 488.)  Dillon replied, "I don't drive."  (*Id.*)  Murphy then asked Dillon whether he had been a passenger in a car that was in an accident on the night of April 4.  (*Id.*)  Dillon said, "No comment."  (*Id.*)  Murphy showed Dillon a photograph of a watch resembling the watch that the police had recovered.  (Tr. at 489-90.)  He asked Dillon whether he owned a similar watch, and Dillon replied, "Yes, I do."  (*Id.*)  When Murphy asked where the watch was, Dillon responded, "No comment."  (*Id.*)  The interview lasted approximately one hour and fifteen minutes.  (Tr. at 490.)

### b. Shania Davis

On direct examination, the prosecutor questioned Davis about a statement that she had made to Detective Murphy on August 5, 2003. (Tr. at 69.) Davis frequently responded that she did not know or could not recall the events that she had described in her statement. (*Id.*) Over repeated objections, the prosecutor attempted to elicit her testimony as to conversations that allegedly took place in the Dodge after the shooting. (Tr. at 65-74.) He asked, "Didn't [Dillon] say in the car on the Westside Highway, after your left the scene, he started talking and said how I shot one of the guys in the Jeep, didn't he say that?" (Tr. at 67.) Davis said she did not know. (*Id.*) The court referred Davis to her written statement to see if it would refresh her recollection. (*Id.*) When the statement did not refresh Davis's memory, the prosecutor asked her why she had told the police about Dillon's alleged admission, and whether she had provided a false statement. (*Id.*) Davis insisted that she had told Detective Murphy she was not sure if that portion of her statement was accurate. (Tr. at 67-71.) The prosecutor pointed out that Davis had crossed out certain sections of her statement but the reference to Dillon's alleged admission was not among them. (Tr. at 72.) Davis said that she learned of the alleged admission from Mingo, prompting the prosecutor to ask her if Mingo told Davis in the car that Dillon said he had shot someone. (Tr. at 72-73.) Davis answered, "Yes." (Tr. at 73.)

The prosecutor then questioned Davis about visiting Mingo at Riker's Island on August 27, 2003. (Tr. at 73.) Mingo spoke to her about Dillon's case and knew that she was going to testify. (*Id.*) The prosecutor offered Davis's unsigned hand-written statement into evidence. (Tr. at 74.) Defense counsel objected, and the court reserved judgment. (*Id.*)

On redirect, the prosecutor asked Davis: "You said you learned about [Dillon] saying he shot someone in the Jeep from [Mingo]?" (Tr. at 83.) The court overruled the defense's

objection. (Tr. at 84.) Davis repeated that she had told Murphy that she learned about Dillon's alleged admission from Mingo. (Tr. at 83-84.) Again, the prosecutor asked: "Then you wrote down that [Dillon] said how he shot one of the guys in the Jeep; isn't that correct?" (Tr. at 84.) The prosecutor asked whether Mingo had visited Davis at home soon after the shooting and told her that "he was sorry about what had happened, that he was trying to be nice and the other guys were getting loud and he told me he shot one of the guys and that [Dillon] shot the other guy?" (Tr. at 85.) Throughout this line of questioning, Davis explained that she learned of the incident from others, including Mingo. She also reiterated that she was unsure if the information she received was true. (Tr. at 83-84.) The defense made repeated objections and the trial court denied or did not acknowledge three requests by the defense to approach. (*Id.*) The prosecutor again offered Davis's statement, and the court reserved judgment. (*Id.*)

### c. Ezkiel Jiles

Jiles testified that one of the persons who drew a gun was wearing a green outfit: "I'm not too sure exactly what it was . . . I just saw blurs of green." (Tr. at 273.) He did not remember what article of clothing was green, but after reading his prior testimony, he stated that the man wore a flight jacket. (Tr. at 276.) When asked if he remembered the green and orange flight jacket Dillon wore, Jiles said he did not see orange but did see green. (Tr. at 276-77.) Jiles also testified that he saw two other men reach for guns, one of whom wore a "table cloth shirt" that Jiles thought was green. (Tr. at 279-82.)

### 3. Evidentiary Rulings during Trial

After Davis testified, the court held a bench conference outside the presence of the jury. (Tr. at 86-95.) The court felt that Davis was trying to "shield people that she was involved with" and declared her a hostile witness, allowing the prosecutor to ask leading questions. (*Id.* at 87.)

9

Defense counsel objected on the record that the prosecution had violated C.P.L. § 60.35 and C.P.L.R. § 45.14, the "voucher rule," by attempting to impeach its own witness. (*Id.* at 88.) The defense argued that Davis's testimony was not impeachable, because her failure to recollect previous events or statements did not tend to disprove the prosecutor's case, but merely failed to corroborate it. (*Id.* at 89.) The defense further argued that the portions of Davis's statements recounting what Mingo had allegedly told her constituted hearsay. (*Id.* at 91.)

On September 28, 2003, the morning after Davis testified, the court issued a curative instruction directing the jury to disregard Davis's testimony regarding her written statement, any conversations that may have taken place in the car following the incident, and any out-of-court statements that Mingo may have made to Davis regarding the incident. (*Id.* at 163.) The court ordered the testimony "stricken from the record as if it never happened." (*Id.*) The defense immediately moved for a mistrial, arguing that the curative instruction was insufficient to overcome the prejudicial effect of the stricken testimony. (*Id.* at 160-61.) The court denied the motion but instructed the prosecutor not to refer to Davis's statements on summation or use it in any way to question any other witnesses. (*Id.* at 160-62.) Later, at the charge conference, the court warned the prosecutor not to mention Davis's statements in his summation. (*Id.* at 528.)

Defense counsel asked the court to instruct the jury on the affirmative defense for felony murder under N.Y.P.L. § 125.25(3).[1] The court refused on the ground that Dillon was unable to produce evidence of each element of the defense. (Tr. at 534.)

---

[1] The elements of this defense are: 1) defendant did not commit the homicidal act or aid in its commission; 2) defendant was not armed; 3) defendant had no reasonable suspicion that any other participant was armed; and 4) defendant had no reasonable ground to believe that any participant intended to engage in conduct likely to result in death. N.Y.P.L. §125.25(3)

### 4. The Prosecution's Summation

On summation, the prosecutor argued that Dillon had waived his right to remain silent

and the right to counsel when he was in Detective Murphy's custody. (Tr. at 572.) He said:

> [W]hen a person is taken into custody there are three ways you can react if the
> police decide to question you. The first thing you can do is ask for a lawyer. And
> every one of you, the defendant, everybody here, has that constitutional right.
> That's guaranteed by the federal Constitution and the state Constitution and
> nobody can make an inference unfavorable to anybody who exercises his right to
> counsel . . . The second way is they can decide to remain silent . . . That too is a
> constitutional right. You have every right to say that to an officer, and you cannot
> draw any inference unfavorable to a person who does that, but the third thing you
> can do is actually waive your rights and talk to the police. And that's what this
> defendant did here. He didn't request a lawyer. He didn't request to remain silent.
> Instead he's asked a question. Having been advised of your rights are you willing
> to talk to me at this time? I want a doctor.

(*Id.* at 571-72.) Later in his remarks, the prosecutor contrasted Dillon's responses to Murphy's

questioning with Davis's testimony, in an apparent attempt to demonstrate that Dillon's

responses were inconsistent with being a non-participant in the crimes:

> [W]hen the police come to [Davis's] door she says, all right, all right. I was there
> and I didn't participate and this is what happened. Well, here's the defendant's
> opportunity to say that. Instead, yeah, I own a watch like that. Where is it? No
> comment. Were you involved in a fender bender two days earlier? I don't drive
> a car. Well, were you a passenger in a car involved in a fender bender. No
> comment. I mean, ladies and gentlemen, one of every citizen's biggest problem
> [sic] with bureaucrats is that they won't listen. And Detective Murphy is sitting
> down saying I'm prepared to listen and the defendant slams the door in his face.
> He doesn't say anything about him being at the scene and not participating. He
> says nothing at all about that.

(*Id.* at 574-75.) When defense counsel objected, the court pointed out that although every

defendant has a right to remain silent, both sides may comment on any statements the defendant

did make, and the jury may draw inferences from those statements. (*Id.* at 576.)

At another point in his summation, the prosecutor argued that Dillon gave a "limited

statement" to the police because he was a participant in the crimes. (*Id.* at 600-01.) He said,

"[W]hen the police arrive at [Dillon's] doorstep on April 27th, he doesn't tell Detective Murphy when he finally emerges. doesn't say let me tell you what happened. I was a non-participant in this crime." (*Id.*) Defense counsel objected and the objection was overruled. (*Id.*) The prosecutor continued: "Now, you know why he gives a [sic] limited statement that he does. Because he is a participant in this crime, members of the jury." (*Id.*)

During a recess after the prosecutor's closing statement, defense counsel objected to the prosecutor's arguments about Dillon's silence. (Tr. at 604-06.) The court responded that the prosecutor "did not argue silence, he argued what [Dillon] said and what [Dillon] left out." (*Id.*) The defense argued that the prosecutor improperly contrasted Dillon with "an innocent witness, like Shanya [sic] Davis . . ." Maintaining that the prosecutor's comments were about Dillon's choice to remain silent, the defense renewed its motion for a mistrial and alternatively asked that the court give a curative instruction to the jury. (*Id.*) The court declined to declare a mistrial and reiterated that the jury would not receive another curative instruction, finding that Dillon had the right not to make any statements while in custody, but that the People could comment on any statements that he did make. (*Id.*)

## C. Procedural History

On December 17, 2004, the jury convicted Dillon of murder in the second degree, attempted robbery in the first degree, assault in the first degree, criminal possession of a weapon in the second degree (two counts), criminal possession of a weapon in the third degree (two counts) and reckless endangerment. He was sentenced to an aggregate term of thirty years to life. On January 5, 2005, Dillon filed an appeal with the Appellate Division, First Department, arguing that his conviction should be reversed because: 1) the prosecutor violated his Fifth Amendment right against self-incrimination by referring on summation to his selective refusal to

12

answer questions while in custody; 2) the trial court abused its discretion by delivering a curative instruction as a remedy instead of declaring a mistrial when the prosecutor introduced inadmissible hearsay, referred to it on summation after it was stricken, and vouched for Davis's credibility on summation; 3) the trial court erred in refusing to instruct the jury on the statutory affirmative defense to felony murder; 4) the trial court erred in allowing Jiles to recite from a hearsay document because the document did not refresh his recollection; and 5) the trial court erred in admitting Dillon's statements about his leg injury because it was not properly noticed that the prosecution intended to introduce the statement at trial under New York Criminal Procedure Law ("N.Y.C.P.L.") § 710.30(1)(a). (Habeas Petition Memorandum ("Habeas Mem.") at i-ii.)

On June 6, 2006, the Appellate Division affirmed Dillon's conviction, holding that: 1) the prosecution's summation remarks did not violate Dillon's right to remain silent because the prosecution is entitled to reference any voluntary statements that Dillon made to the police and, in any case, the court's curative instruction to the jury was sufficient to prevent any prejudice; 2) the court properly denied Dillon's mistrial motion because it provided an adequate remedy by striking the "hearsay" testimony and delivering curative instructions during and at the end of the trial; 3) the court properly declined to instruct the jury on the affirmative defense to felony murder because Dillon did not meet the burden of proof for the elements required for the charge; 4) Dillon failed to preserve his claim regarding Jiles's recitation of a prior out-of-court statement, and 5) Dillon's notice deficiency claim was without merit because Dillon had a full opportunity to litigate the issue. *People v. Dillon*, 30 A.D.3d 1135 (1st Dept. 2006).

On July 5, 2006, Dillon sought leave to appeal the Appellate Division's decision to the New York State Court of Appeals. (Application for Permission to Appeal to the Court of

13

Appeals ("Court of Appeals App."), Doc. No. 30, Ex. C.)  He asked the court to decide whether
the Appellate Division erred in: 1) holding that the prosecutor's references on summation to
Dillon's selective responses while in custody did not violate Dillon's Fifth Amendment right; 2)
holding that the cumulative effect of prosecutorial misconduct did not require a mistrial; 3)
affirming the trial court's decision not to charge the affirmative defense to felony murder; and 4)
holding that any deficiency in the notice of Dillon's statements provided by the People was
irrelevant.  (*Id.*)  On August 31, 2006, the Court of Appeals denied Dillon leave to appeal.
*People v. Dillon*, 7 N.Y.3d 812 (N.Y. 2006).

### III.       ANALYSIS

**A. Threshold Issues**

    **1. Timeliness**

    A petitioner must file an application for a writ of habeas corpus within one year of his
conviction becoming final.  28 U.S.C. § 224(d)(1)(A).  A conviction becomes final "'when [the]
time to seek direct review in the United States Supreme Court by writ of certiorari expires'" that
is, ninety days after the final determination by the state court. *Williams v. Artuz*, 237 F.3d 147,
150 (2d Cir. 2001) (quoting *Ross v. Artuz*, 150 F.3d 97, 98 (2d Circ. 1998)).

    Dillon's leave to appeal was denied on August 31, 2006, and his conviction became final
on November 29, 2006.  Unless the statute of limitations had been equitably tolled, Dillon was
required to file on or before November 29, 2007, in order for his federal habeas petition to be
timely.  Dillon filed his Petition for a writ of habeas corpus on November 30, 2007.  (Doc. No.
1.)  The same day, he filed a motion for a writ of error *coram nobis* in state court alleging

ineffective assistance of appellate counsel. [2]  (*Id.*)  On February 1, 2008, Smith filed a pre-answer motion to dismiss Dillon's petition on timeliness grounds (Doc. No. 5), and on August 5, 2008, the Honorable George B. Daniels dismissed the petition as untimely.  (Doc. Nos. 16 and 18.)  On April 26, 2011, the Second Circuit vacated the judgment of the District Court and remanded the action, finding that specific circumstances allowed for equitable tolling of one day. *Dillon v. Conway*, 642 F.3d 358 (2d Cir. 2011) ("[G]iven the lawyer's deeply misleading statement to his client that he would not wait until the last day to file the petition, the specific facts of this case constitute an extraordinary circumstance sufficient to warrant equitable relief").

On September 25, 2012, the Honorable Andrew L. Carter, Jr. granted Dillon's motion to amend the Petition to include claims raised in his *coram nobis* application.  (Order Granting Motion to Amend Petition, Doc. No. 38 at 10); *Dillon v. Conway*, No. 07 Civ. 10728 (ALC)(RLE), 2012 WL 4832810 (S.D.N.Y. 2012).  On November 29, 2012, Dillon filed the present Amended Petition.  (Doc. No. 39.)

### 2.  Exhaustion

A federal court may not consider a petition for habeas corpus unless the petitioner has exhausted all state remedies, procedurally and substantively. 28 U.S.C. § 2254(b)(1)(A); *Picard v. Connor*, 404 U.S. 270, 275 (1971); *Dorsey v. Kelley*, 112 F.3d 50, 52 (2d Cir. 1997).  In order for a claim to be procedurally exhausted, the petitioner must raise a claim at each level of the state court system, "[presenting] the substance of his federal claims to the highest court of the

---

[2] On November 30, 2007, Dillon filed a motion for a writ of error *coram nobis* in the Appellate Division, arguing that his appellate counsel had been ineffective in failing to: a) argue that trial counsel was ineffective for not requesting a circumstantial evidence jury instruction; b) argue that the evidence was factually and legally insufficient to sustain his conviction; and c) ask the Appellate Division for a circumstantial evidence instruction. (Motion for Corum Nobus [sic] Relief, Doc. No. 30, Ex. F.)  On April 22, 2008, the Appellate Division denied Dillon's motion.  (Denial of *Coram Nobis* Relief, Doc. No. 30, Ex. I.)

pertinent state." 28 U.S.C. § 2554(b)(1); *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994) (internal citations omitted); *see also Rose v. Lundy*, 455 U.S. 509, 510 (1982) (federal district court must dismiss a "petition for a writ of habeas corpus containing any claims that have not been exhausted in the state courts").

A petitioner must also utilize all available procedures permitted by state law to meet the exhaustion requirement. *See* 28 U.S.C. § 2254(c). In New York, a petitioner must file a § 440 motion to vacate judgment if a claim was not raised on direct appeal that requires exhaustion. *Reyes v. Keane*, 118 F.3d 136 (2d Cir. 1997). A claim is substantively exhausted when: (1) "the nature or presentation of the claim [in state court, was] . . . likely to alert the court to the claim's federal nature," and (2) the claim presented to the habeas court is "substantially equivalent" to the claims brought in state court. *Jones v. Keane*, 329 F.3d 290 (2d Cir. 2003); *see also Daye v. Attorney General*, 696 F.2d 186, 192 (2d Cir. 1982). The factors used to determine whether a claim that a petitioner presented in state court was sufficiently federal in nature are (1) whether a "defendant relies on federal constitutional precedents" and (2) whether the "claim rests on a factual matrix that is well within the mainstream of due process adjudication." *Daye*, 696 F.2d at 192.

### a. Exhausted Claims

Dillon has raised six claims for review. Of these six, one is exhausted, and one is partially exhausted. A portion of Dillon's first claim, that the trial court violated his Fifth Amendment rights by allowing the prosecutor to refer on summation to his "no comment" statements, is exhausted because he raised it in his appeal to the Appellate Division, First Department (Habeas Mem. at 16), and in his request for leave to appeal to the Court of Appeals. (Court of Appeals Application ("App."), Doc. No. 30, Ex. B at 1.)

16

Dillon's third claim, that pervasive prosecutorial misconduct deprived him of a fundamentally fair trial, is also exhausted.  Dillon argued in his brief to the Appellate Division, First Department, and his request for leave to appeal to the Court of Appeals, that the prosecutor's conduct violated his Fifth Amendment right against self-incrimination.  (Habeas Mem. at 16.)  He alerted the court to the federal nature of his claim, particularly by citing cases with similar fact patterns in which New York Courts ruled that the defendant was denied a right to a fair trial.  *See Jones v. Vacco*, 126 F.3d 408, 413 (2d Cir. 1997) (citing *Daye*, 696 F.2d at 192.)[3]

### b.  Unexhausted Claims

Dillon's remaining claims are unexhausted.  Dillon did not raise, either on direct appeal or in his request for leave to appeal, his claim that the trial court admitted Murphy's testimony regarding his "no comment" statements in violation of his Fifth Amendment right against self-incrimination.  (*See generally* Habeas Petition and Court of Appeals App., Doc. No. 30, Ex. B.)  Therefore, this portion of Dillon's first claim is unexhausted.  *See Picard*, 404 U.S. at 275 (substance of federal habeas corpus claim must be fairly presented to the state court.)

Dillon further argues in his Amended Petition that the trial court erred in allowing, and the prosecutor erred in eliciting, inadmissible hearsay testimony during the trial and on summation after the court had delivered a curative instruction.  He alleges that these errors

---

[3] Dillon cited, for example, *People v. Collins*, 12 A.D.3d 33 (1st Dept. 2004), in which the prosecutor, despite a warning from the trial court, improperly commented on the defendant's silence and vouched for the credibility of the People's witness. (Habeas Mem. at 17.)  Although the trial court sustained defense counsel's objection and gave curative instructions in *Collins*, the Appellate Division remanded the case for a new trial because the culmination of the prosecutor's improper comments violated the defendant's Fifth Amendment rights.  *Collins*, 12 A.D.3d at 39-42 ("[W]hile any particular instance, standing alone, would not necessarily justify reversal, the cumulative effect of the remarks served to deprive defendant of a fair trial").  By citing *Collins*, Dillon alerted the court to a case in which the state court deemed a similar fact patterns as appropriate for constitutional analysis. *See also Daye*, 696 F.2d at 194.

violated his rights of confrontation, Due Process, and his right to a fundamentally fair trial.
(Habeas Mem. at 21, 23, 26.)  Smith argues that Dillon's claims did not fairly apprise the state
courts of the constitutional substance of his claim because Dillon did not cite constitutional
amendments, "state the terms 'Confrontation Clause' or 'due process of law,'" or cite any federal
cases "employing a federal constitutional analysis to a like set of facts."  (Doc. No. 31 at 51.)

    The Second Circuit has held that "a defendant's claim that he was deprived of a fair trial
because of the admission in evidence of a statement objectionable as hearsay would not put the
court on notice that the defendant claimed a violation of his constitutional right to be confronted
by his accusers." *Daye v. Attorney General of New York*, 696 F.2d 186, 194 (2d Cir. 2003); *see
also Kirksey v. Jones*, 673 F.2d 58, 60 (2d Cir. 1982) ("[A]lleging lack of a fair trial does not
convert every complaint about evidence or a prosecutor's summation into a federal due process
claim").  Whether a claim that the defendant has been denied a fair trial involves a constitutional
claim depends on whether the claim "rests on a factual matrix that is 'well within the mainstream
of due process adjudication.'" *Daye*, 696 F.2d at 193 (quoting *Johnson v. Metz*, 609 F.2d 1052,
1057 (2d Cir. 1979)).  Even if the factual allegations raised by the petitioner are "not treated
generally as having a constitutional dimension . . . if the courts of the state in question have
themselves previously treated that fact pattern as appropriate for constitutional analysis, it would
be unreasonable to suppose that they are not alert to constitutional considerations." *Daye*, 696
F.2d at 194.

    Dillon's references to a "fair trial" and his factual allegations regarding the improper
admission of hearsay were insufficient to apprise the state court of a Confrontation Clause claim.
*See Daye*, 696 F.2d at 194.  The New York Appellate Division has recognized that when the
content of hearsay is highly prejudicial, the admission of such hearsay is not harmless error and

18

is a constitutional violation. *People v. Matthews*, 148 A.D.2d 272 (4th Dept. 1989) (finding that defendant was denied a fair trial in part because of improperly admitted hearsay testimony of an uncharged crime.) While Dillon cited *Matthews* in his Appellant's Brief, the facts in this case are not fundamentally similar enough to notify the court of the constitutional nature of Dillon's claims. *Id.* In *Matthews*, the trial court permitted a witness to testify about a portion of the defendant's hospital record that contained a reference to a prior arson threat made by the defendant. *Matthews*, 148 A.D.2d at 272. The Appellate Division held that such an admission "contained material relating to prior threats of arson and other uncharged crimes," and that evidence of uncharged crimes was excluded because juries may be led to convict based on a defendant's history. *Id.* at 277. Although the court in *Matthews* issued a curative instruction, the Appellate Division found that the instruction was not sufficient to overcome the highly prejudicial nature of the admitted hearsay.

In Dillon's case, the trial court also delivered a curative instruction to rectify the prosecutor's inadmissible hearsay error. (Tr.) The elicited hearsay, however, was not about an uncharged crime, but rather was directly related to the investigation of Dillon for the charges that were before the jury. The hearsay did not pose the same threat of misleading the jury as the hearsay admitted in *Matthews*. Therefore, Dillon did not establish, by citing *Matthews*, that the New York appellate courts were alert to the constitutional considerations of his inadmissible hearsay claims. *See Daye*, 696 F.2d at 194. Because Dillon did not properly alert the court to the federal nature of his claims either on direct appeal or in his request for leave to appeal, the claims are unexhausted.

Dillon's claim for ineffective assistance of trial counsel is also unexhausted. He raised his ineffective assistance of trial counsel claim for the first time in his *coram nobis* petition. In

19

New York, when a defendant claims his right to appeal has been frustrated by ineffective assistance of counsel, the "defendant's right and remedy is by *coram nobis* petition." *Taylor v. Scully*, 674 F. Supp. 462, 463 (S.D.N.Y. 1987) (quoting *People v. Adams*, 190 N.E.2d 529, 531 (N.Y. 1963)). The writ of *coram nobis* is not the proper venue for raising a claim for ineffective assistance of trial counsel, as it is limited to issues involving ineffective assistance of appellate counsel. *See Turner v. Artuz*, 262 F.3d 118, 132 (2d Cir. 2001); *People v. Syville*, 15 N.Y.3d 391, 397-99 (N.Y. 2001). Therefore Dillon did not fairly apprise the state court of the constitutional substance of this claim, and it is unexhausted.

Finally, Dillion's claim that the court deprived him of his Sixth Amendment right to effective assistance of appellate counsel is also unexhausted. Dillon raised this claim in his *coram nobis* petition, and the Appellate Division denied his motion and leave to appeal. (Doc. No. 30, Ex. E.) Dillon has not sought leave to appeal denial to the Court of Appeals.

### 3. Procedural Default

In addition to the constraint that the exhaustion requirement places on a petitioner's claim, procedural default, also known as a procedural bar, may thwart a petitioner's ability to pursue a claim on its merits. "[A] petitioner who procedurally defaults on his state court remedies is barred from obtaining federal habeas relief . . ." *Picard*, 404 U.S. at 275; *see also Jones*, 126 F.3d at 414 (citing *Ellman v. Davis*, 42 F.3d 144, 147 (2d Cir. 1994)); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Federal habeas review is precluded where the petitioner fails to properly raise objections or appeals to the state courts, unless the petitioner "can demonstrate cause for the default and actual prejudice . . . or demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750; *see also Harris v. Reed*, 481 U.S. 255, 258 (1989). The Supreme Court has defined "cause"

20

as a showing that "some objective factor external to the defense impeded counsel's efforts to raise the claim in state court." *McCleskey v. Zant*, 499 U.S. 467, 493 (1991) (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). The "fundamental miscarriage of justice" claim "is only available where the petitioner can supplement his constitutional violation with 'a colorable showing of factual innocence'" in the form of newly adduced evidence of innocence. *Washington v. Superintendent, Otisville Correctional Facility*, No. 96 Civ. 2729 (SAS), 1997 WL 178616, at *7 (S.D.N.Y. April 11, 1997) (quoting *McCleskey*, 499 U.S. at 494); *see also Schlup v. Delo*, 513 U.S. 298, 332 (1995).

Dillon can no longer raise his unexhausted self-incrimination, hearsay, or confrontation clause claims in state court because he failed to raise them in his prior appeals. New York Criminal Procedure Law prohibits relief on a claim that could have been raised on direct appeal. N.Y. Crim. Proc. Law § 440.10(2)(c); *see Teague v. Lane*, 489 U.S. 288, 297-98 (1989); *Grey v. Hoke*, 993 F.2d 117, 121 (2d Cir. 1991). Dillon's failure to raise these claims bars their federal review here. *See Bossett*, 41 F.3d at 826-28; *Grey*, 933 F.2d 117, 120-21 (1991). Thus, the claims are procedurally barred from habeas review unless he can "demonstrate cause for the default and actual prejudice . . . or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

Dillon does not raise, and the record does not reflect, any facts or newly adduced evidence to demonstrate prejudice or a fundamental miscarriage of justice regarding these claims. These claims are procedurally barred from habeas review, and are deemed exhausted.

### 4. Mixed Petitions

Prior to the enactment of the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), "mixed" petitions — those presenting both unexhausted and exhausted claims —

21

were dismissed in their entirety. *See Rose v. Lundy*, 55 U.S. 509 (1982). However, pursuant to

AEDPA, federal courts may deny mixed petitions on their merits notwithstanding a petitioner's

failure to exhaust state judicial remedies. 28 U.S.C. § 2254(b)(2); *see, e.g., Hogan v. Ward*, 998

F. Supp. 290, 293 (W.D.N.Y. 1998) ("[w]here a court deems unexhausted claims to be patently

frivolous, it may now address the merits of both exhausted and unexhausted claims"); *see also*

*Loving v. O'Keefe*, 960 F. Supp. 46 (S.D.N.Y. 1997).

Dillon's petition is a "mixed" petition. Several of his unexhausted claims are

procedurally barred from review. Dillion's ineffective assistance of trial and appellate counsel

claims, though unexhausted are not barred. These claims, however, are without merit, allowing

the Petition to be resolved on the merits under AEDPA.

## B.  Merits of Dillon's Claims

### 1.   Standard of Review

A federal court may grant a writ of habeas corpus if a petitioner demonstrates one of two

conditions: "the state-court adjudication resulted in a decision that (1) 'was contrary to . . .

clearly established Federal law, as determined by the Supreme Court of the United States,' or (2)

'involved an unreasonable application of . . . clearly established Federal law as determined by the

Supreme Court of the United States.'" *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (quoting 28

U.S.C. § 2254(d)(1)-(2)). A state court decision is "contrary to" federal law "if the state court

arrives at a conclusion opposite to that reached by [the] Court on a question of law" or if it

"decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Id.*

at 413. A state court decision involves an "unreasonable application" of Supreme Court

precedent "if the state court identifies the correct governing legal principle from [the] Court's

decisions but unreasonably applies that principle to the facts of the prisoner's case" *Id.* Finally,

22

"clearly established federal law, as determined by the Supreme Court of the United States" refers only to Supreme Court "holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision." *Id.* at 412.

State judicial determinations are afforded even more deference than before the passage of the AEDPA. *Rodriguez v. Bennett*, No. 98 Civ. 580 (LBS), 1998 WL 765180, at *3 (S.D.N.Y. Nov. 2, 1998). In reviewing state court factual determinations, the Court "must apply a presumption of correctness . . . unless rebutted by clear and convincing evidence." *Id.* Further, "[w]hen reviewing a mixed question of law and fact, the federal court must defer to the judgment of the state court provided the state court determination does not constitute an 'unreasonable application' of clearly established federal law as determined by the Supreme Court." *Id.*

### 2.  Fifth Amendment "Selective Invocation" Claim

The Fifth Amendment guarantees the right against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436 (1966). When criminal defendants indicate that they wish to remain silent, interrogation cannot continue, and the silence may not be used against them. *Id.* at 473-74; *see also Doyle v. Ohio*, 426 U.S. 610, 618 (1976). While the right to remain silent belongs to the defendant and may be invoked at any time, a defendant's invocation of that right must be unequivocal. *Miranda*, 384 U.S. at 436; *see also Campaneria v. Reid*, 891 F.2d 1014, 1021 (2d Cir. 1989), *cert. denied*, 499 U.S. 949 (1991). Invocation of the right to remain silent, however, must be construed liberally. *Hoffman v. United States*, 341 U.S. 479, 486 (1951). An accused need not rely on talismanic phrases or 'any special combination of words' to invoke the right. *Quinn v. United States*, 349 U.S. 155, 162 (1995).

Dillon argues that he "selectively invoked" his right to remain silent during his police interrogation when he said "no comment" in response to questions concerning the incident, and

that the trial court violated his Fifth Amendment rights by admitting his statements into evidence. Immediately after verbally acknowledging that he understood his Miranda rights, Dillon requested medical attention for his leg. (Tr. at 487.) Detective Murphy asked to examine Dillon's leg, but told him he had a few questions before Dillon would receive medical attention. (*Id.*) Murphy then began asking Dillon questions about the incident. Dillon replied, "I don't drive," when Detective Murphy said he was investigating a vehicle accident. (*Id.* at 488.) He answered other questions related to the incident by responding "no comment" to questions such as "were you a passenger in a car that had been in an accident on the night in question?" (*Id.*) He also voluntarily responded to two of Murphy's questions — whether Dillon owned a watch similar to the one in a photo, and where the watch was. (*Id.* at 490.)

Dillon argues that his conduct constituted "selective invocation" of the right to remain silent because he only answered questions indirectly related to the incident. This argument is without merit. While some circuit courts support the view that Fifth Amendment rights may be selectively invoked during a police interrogation after a defendant has voluntarily responded to law enforcement's questions, [4] neither the Supreme Court, nor the Second Circuit, has adopted selective invocation of the right to remain silent. Rather, the Supreme Court has held that a defendant waives silence after he has been read his Miranda rights and voluntarily responds to law enforcement's questions without any coercion. *Berghuis v. Thompkins*, 560 U.S. 370 (2010) (holding that the defendant waived his right to remain silent when he knowingly and voluntarily made a statement to police after being read his Miranda rights).

---

[4] For example, the Ninth Circuit held in *Hurd v. Terhune* that "a suspect may remain selectively silent by answering some questions and refusing to answer others without taking the risk that his silence may be used against him on trial." 619 F.3d 1080, 1087 (9th Cir. 2010). The court relied on the holding in *Miranda* that a suspect may invoke his right to silence "at any time." *Id.* (quoting *Miranda*, 384 U.S. at 473-74). *See also United States v. Canterbury*, 985 F.2d 483, 486 (10th Cir. 1993); *United States v. Scott*, 47 F.3d 904, 907 (7th Cir. 1995).

Here, Dillon responded to two of Murphy's questions. He also refused to sign the Miranda statement, did not ask for an attorney, and did not request that Murphy end the line of questioning. Dillon's "no comment" statements cannot be equated with silence in the context of interrogation under *Miranda*. His behavior is similar to the actions of the defendant in *Berghuis*, who answered a question three hours after receiving a *Miranda* warning, and gave sporadic answers to questions throughout interrogation. *Id.* at 386.

Dillon relies on *Doyle v. Ohio*, which prohibits the prosecution in a criminal case from calling attention to a defendant's post-*Miranda* silence. 426 U.S. at 610. Dillon, however, was not silent, and did not invoke his right to remain silent. When defense counsel objected to the prosecutor's comments, the court held that although every defendant has a right to remain silent, both sides may comment on any statements that the defendant did make, and the jury may draw inferences from those statements. (Tr. 576.)

Dillon also argues that *Griffin v. California*, 380 U.S. 609 (1965), protects his "no comment statement" from prosecutorial commentary. In *Griffin*, the trial court instructed the jury that the failure of the defendant to testify at trial was a factor the jury could consider as unfavorable toward the defendant. *Id.* at 610. Furthermore, during his summation at the penalty proceeding, the prosecutor told the jury to draw a negative inference from the defendant's failure to testify at trial. *Id.* The Supreme Court held that the collective comments made by the judge and the prosecutor on the defendant's silence were unconstitutional. *Id.* at 615. The principle articulated in *Griffin* cannot be applied to Dillon's case because Dillon was not silent, and did not unequivocally invoke his right to remain silent. Because the state court's ruling was not contrary to clearly established Supreme Court precedent, I recommend that Dillon's claim that

the prosecutor violated his Fifth Amendment rights by referencing his "no comment" statements on summation be **DENIED**.

### 3. Pervasive Prosecutorial Misconduct Claim

A prosecutor's misconduct will require reversal of a state court conviction only where the remark sufficiently infected the trial as to make it fundamentally unfair and, therefore, a denial of due process. *Donnelly v. DeCristoforo*, 416 U.S. at 637, 745 (1974); *see also United States v. Coriaty*, 300 F.3d 244, 255 (2d Cir. 2002). To prevail on a claim of prosecutorial misconduct, a defendant must show that the prosecutor engaged in "egregious misconduct . . . amount[ing] to a denial of constitutional due process." *Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir. 1990) (quoting *Donnelly*, 416 U.S. at 647-48). Harmful error, which renders a trial unfair, is determined by ". . . whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Coleman*, 386 U.S. at 23. The Supreme Court has evaluated whether a prosecutor's remarks constitute harmful error by analyzing the severity of the alleged misconduct, the curative measures taken, and the likelihood of conviction absent any misconduct by evaluating the sufficiency of the evidence. *See Donnelly*, 416 U.S. at 636; *Greer v. Miller*, 483 U.S. 756, 766-67 (1987); *Daren v. Wainwright*, 477 U.S. 168, 182 (1986). When considering whether the prosecutor's comments deprived the petitioner of a fair trial, it is necessary to "place [t]he remark in context." *Darden*, 477 U.S. at 179 (1986).

The Supreme Court has recognized that there are no error-free trials. *United States v. Hasting*, 461 U.S. 499, 508-09 (1983); *Brown v. United States*, 411 U.S. 223, 231-32 (1973). There have been cases in which misconduct of the prosecuting attorney was pronounced and persistent, with a probably cumulative effect upon the jury, which required reversal. *See, e.g., Berger v. United States*, 295 U.S. 78, 89 (1935) (finding that the prosecutor's "improper

suggestions, insinuations, and especially, assertions of personal knowledge" made the misconduct more than slight or confined to a single instance, but pronounced and persistent); *see also U.S. v. Forlorma*, 94 F.3d 91 (2d Cir. 1996) (finding that the prosecutor's unsupported arguments caused substantial prejudice to the defendant and was grounds for reversal). It is well settled law, however, that "inappropriate prosecutorial comments, standing alone, do not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding." *United States v. Young*, 470 U.S. 1, 11 (1985).

Dillon argues that the cumulative effect of pervasive prosecutorial misconduct deprived him of a fundamentally fair trial, and was a violation of Due Process under the Fourteenth Amendment. At trial, in response to the defense's summation urging the jury to consider Dillon's intent and competing inferences of the evidence, the prosecutor referenced previously stricken hearsay testimony, which implicated Dillon in the crime. (Tr. at 571-72.) The prosecutor also impermissibly vouched for a government witness. (*Id.* at 582-83.) The question before this Court is whether this alleged misconduct, when weighed against the curative measures taken and the sufficiency of the evidence, so clearly impacted the jury's verdict as to constitute harmful error.

### a. The Prosecutor's Actions

The day after Davis testified, the court delivered a curative instruction striking the testimony related to her written statement, conversations in the car, and any out of court statements made by Mingo to Davis. (Tr. at 163.) The court's rationale was that a curative instruction was sufficient to prevent harmful error because Davis's testimony was early in the trial and, once struck, it would not impact the jury's decision. (Tr. at 160.)

27

The prosecutor, however, spent a significant portion of his summation discussing the importance of Davis's testimony and its damaging nature. (Tr. at 574-84.) Specifically, the prosecutor spent time detailing Mingo and Davis's romantic relationship and the difficult logistics of Davis's trip to visit Mingo in prison. (*Id.*) He stated that Davis "committed a lot of effort to go out and meet with him [Mingo] and she talked, she said, a little bit about the case." (Tr. at 582.) These comments were particularly damaging because the entirety of Davis's testimony about her conversation with Mingo concerned Dillon's role as a shooter in the incident. (Tr. at 73, 84.) In referencing this conversation, the prosecutor directed the jury's attention to hearsay testimony, and notably the only testimony which implicated Dillon.

The prosecutor also vouched for Davis as a credible witness and argued her testimony should not be ignored despite the judge's instruction:

> But because she [Davis] has an interest or bias doesn't mean you have to ignore her testimony. I submit to you because she doesn't want to help the People her testimony is more damaging towards the defendant and it makes it more reliable, her testimony is damaging in many ways. One of the major things she gives you, members of the jury, is the identification of the parties.

(Tr. at 582-83.) The prosecutor also vouched for Davis's credibility on summation by arguing that she was willing to speak to the police because she was an innocent bystander. (*Id.*) He compared Davis's willingness to speak to the police to Dillon's "no comment" statements, which he equated with guilt:

> [W]hen the police come to [Davis's] door she says, all right, all right. I was there and I didn't participate and this is what happened . . . Detective Murphy's testimony is sitting down saying I'm prepared to listen and the defendant slams the door in his face. He doesn't say anything about him being at the scene and not participating.

(Tr. at 574-75.) The prosecutor's argument suggested that Dillon's inaction was equal to guilt, and improperly relied on Davis's stricken statements.

28

### b.  Impact on the Jury

In many cases, the jury can follow the trial judge's curative instructions to disregard information, but ". . . there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant that the practical and human limitations of the jury system cannot be ignored." *Bruton v. United States*, 391 US. 123, 136-36 (1968).  Furthermore, a "prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose[s] two dangers: such comments can convey that evidence was not presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *United States v. Young*, 470 U.S. 1, 18-19 (1985).

Although the judge reminded the jury not to evaluate stricken testimony in her charge, the court's efforts to eradicate any prejudicial effect was undermined when the prosecutor blatantly reminded the jury of Mingo and Davis's out of court conversations on summation.  The benefit of the prior curative instruction had already been erased by the prosecutor's conduct.  The trial court did, however, give a brief reminder in the course of a lengthy charge to further correct the prejudicial effect of the prosecutor's actions.

### c.  Sufficiency of the Evidence

AEDPA requires the Court to deem factual determinations by a state court correct absent clear and convincing evidence to the contrary.  28 U.S.C. § 2254(e)(1); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  The Court may grant relief to a petitioner on the grounds of insufficient evidence only where the state court decision was based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

29

28 U.S.C. § 2254(d)(2).  Such a decision will not be overturned on factual grounds unless "objectively unreasonable" in light of the evidence presented.  *Miller-El*, 537 U.S. at 340.

To analyze the sufficiency of the evidence of a state conviction, "[a] federal court must look to state law to determine the elements of the crime."  *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) (quotation omitted).  A habeas petition based on the evidentiary sufficiency of a state-court conviction fails if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (holding that it is the Court's duty to defer to state court findings of fact, "so long as 'fair-minded jurists could disagree' on the correctness of the state court's decision.") (internal citations omitted)).  The Second Circuit has noted that a defendant challenging the sufficiency of the evidence supporting his conviction bears a heavy burden because the government receives the benefit of having all permissible inferences drawn in its favor.  *United States v. Parkes*, 497 F.3d 220, 225 (2d Cir. 2007).   When "faced with a record of historical facts that supports conflicting inferences, [this Court] must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *Wheel v. Robinson*, 34 F.3d 60, 66 (2d Cir. 1994), *cert. denied*, 514 U.S. 1066 (1995) (quoting *Jackson*, 443 U.S. at 326).

Dillon failed to show that the People's interpretation of events did not establish the essential elements of each crime beyond a reasonable doubt in the minds of the jury.  Dillon was convicted of: attempted robbery in the second degree (defendant attempts to forcibly steal property while armed with a deadly weapon, *see* N.Y.P.L. §§ 110.00; 160.15(2)); two counts of criminal possession of a weapon in the second degree (such person possesses five or more

firearms, *see* N.Y.P.L. § 265.03(2)); two counts of criminal possession of a weapon in the third degree (such person possesses a loaded firearm, *see* N.Y.P.L. § 265.02(4) (current version at N.Y.P.L. § 265.03(3)(2006))); and reckless endangerment in the first degree (under circumstances evincing a depraved indifference to human life, a person recklessly engages in conduct which creates a grave risk of death to another person, *see* N.Y.P.L. § 120.25). Dillon was also convicted of assault in the first degree, and murder in the second degree, or "felony murder." A person can be convicted of assault in the first degree if another participant causes serious physical injury to a non-participant during the commission of a felony, or immediate flight therefrom. *See* N.Y.P.L. § 120.10(4). A person can be convicted of felony murder if, acting either alone or with one or more other persons, he commits one of the enumerated felonies, and he or another participant causes the death of a person other than one of participants. *See* N.Y.P.L. § 125.25(3).

The central issues at trial were whether Dillon acted with Mingo in attempting to rob Jiles, and whether a participant in the attempted robbery caused the death of a non-participant. The Court notes that there were several weaknesses in the evidence presented against Dillon. For example, discrepancies and uncertainty in the eyewitness testimonies regarding the clothing worn by the shooter call into question Dillon's particular whereabouts at the scene of the incident. Hamilton testified that he did not see the man with the green flight jacket at the time the first shots rang out. (Tr. at 374.) He did state that he saw a man wearing a checkered shirt pull out a gun and point it in the direction of Mangrum, and that he saw a man in a flight jacket standing at the corner when the confrontation erupted. (Tr. at 357; 376-77.) Jiles believed that the person wearing the checkered shirt with green in it had a gun, and was not sure that the other person with a gun was wearing a green flight jacket. (Tr. at 272-75.) Neither witness described

a person in an orange and green jacket, similar to the jacket worn by Dillon, holding a gun.

The Court further notes that Detective Liota concluded at least two guns were used in the commission of the crime, but there was no testimony that Dillon possessed five or more firearms to support a conviction under N.Y.P.L. § 265.03(2).  It is difficult to comprehend how a rational trier of fact could have found the requisite element for this charge, that Dillon possessed five or more firearms, beyond a reasonable doubt.  An extensive amount of firearm equipment, however, was found at the crime scene.  Additionally there was testimony that Mingo possessed a firearm, that an empty gun was placed in Jiles's hand, and that Jiles believed at least three other men carried firearms.  Furthermore, during deliberations, the jury asked for a recharge on the definition of intent, and whether Dillon was liable for a gun charge if he did not have a gun.  (Tr. at 657.)  The court instructed the jury that Dillon would be liable for the gun even if he did not possess it, provided that he acted in concert to commit a robbery and any one of the participants had a gun.  (Tr. at 660.)

Despite the weaknesses in the case, the jury could have found Dillon guilty beyond a reasonable doubt based on the evidence that he was with Mingo the night of the incident, and was involved in a struggle with Jiles and Mingo.  The evidence supported a finding that several of the participants possessed guns.  There was also evidence that a participant in the crime attempted to take Jiles's necklace when it was ripped from his neck, although when Jiles awoke, it was in his hand.  The trial court instructed the jury that if they found that Dillon had aided Mingo in the attempted robbery, then they could convict him of all the charges.  Because the jury found that Dillon committed one of the enumerated felonies, namely attempted robbery, Mangrum's death was enough for the jury to find that Dillon committed felony murder, assault in the first degree, and reckless endangerment.  Any conflicting inferences about the amount of

32

firearms present and possessed by Dillon during the commission of the crimes must be resolved in favor of the prosecution. *See Wheel*, 34 F.3d at 66.

The evidence before the jury was sufficient for rational triers of fact to convict Dillon. This Court must defer to the trial court's findings of fact on each element of the crimes charged against Dillon, because Dillon has not shown that his conviction was based on an "unreasonable determination of the facts in light of the evidence presented" at trial. *See* 28 U.S.C. § 2254(d)(2). I recommend that this claim be **DENIED**.

### 4. Ineffective Assistance of Trial Counsel

In *Strickland v. Washington*, the Supreme Court established a two-part test to determine ineffective assistance of counsel. 466 U.S. 688 (1984). First, the petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Second, the petitioner must show that "there is reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "[A] court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id.* at 696. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Purdy v. Zeldes*, 337 F.3d 253, 260 (2d Cir. 2003) (quoting *Strickland*, 466 U.S. at 694). While ineffective assistance may be demonstrated where counsel performs competently in some respect but not others, *Eze v. Senkowski*, 321 F.3d 111, 112 (2d Cir. 2003), "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the

circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

Under New York law, in criminal cases "which depend entirely upon circumstantial evidence . . . the facts from which the inference of the defendant's guilt is drawn must be established with certainty — they must be inconsistent with his innocence and must exclude to a moral certainty every other reasonable hypothesis." *People v. Barnes*, 406 N.E.2d 1071, 1073 (N.Y. 1980) (internal quotations omitted). A circumstantial evidence charge would instruct the jury that when there are two viable interpretations of the evidence, but one is consistent with innocence, then the jury should give the defendant the benefit of the doubt. *People v. Sanchez*, 463 N.E.2d 1228, 1229 (N.Y. 1984). Although a "request for a circumstantial evidence instruction must be allowed when proof of guilt rests exclusively on circumstantial evidence," a case involving direct evidence "does not qualify for the circumstantial evidence instruction." *People v. Roldan*, 666 N.E.2d 553, 554 (N.Y. 1996) (no circumstantial evidence charge where eyewitness testimony establishes an element of the crime); *Barnes*, 46 N.E.2d at 1073 ("this legal standard does not apply to a situation where . . . both direct and circumstantial evidence are employed to demonstrate a defendant's culpability").

The Court must determine whether the evidence used to convict Dillon was solely circumstantial or also direct, and whether a circumstantial evidence charge would have altered Dillon's verdict. Direct evidence placed Dillon at the scene of the crime and, as defense counsel pointed out, there are two viable stories, one consistent with Dillon's innocence. (Tr. at 550-56.) There was no direct evidence that Dillon was helping Mingo attempt to rob Jiles or that Dillon possessed a gun. (Tr.) Jiles woke up with his chain in his hand, weakening the prosecutor's

argument that this was an attempted robbery. (*Id.*) Eyewitnesses and photo/video evidence did not place a gun in Dillon's hand. (*Id.*)

In his fifth claim, Dillon argues that defense counsel failed to request a circumstantial evidence jury instruction, depriving him of his Sixth Amendment right to effective assistance of counsel. Although Dillon may have benefitted from a circumstantial evidence instruction, he did not show that unprofessional errors in his counsel's chosen arguments altered the proceeding's result, or that a circumstantial evidence charge would have substantially altered the verdict. *See Barnes*, 406 N.E.2d at 1073. Trial counsel's representation did not fall below an "objective standard of reasonableness" because counsel raised multiple claims, such as the trial court's refusal to charge an affirmative defense to felony murder. Dillon's counsel also argued fervently that there are competing interpretations of the minimal evidence used to convict Dillon, and that his constitutional rights were violated. *Strickland*, 466 U.S. at 688.

Dillon's counsel may have assumed that the claims he chose in the jury instruction was a better strategy, since the jury is tasked with assessing the witness's credibility based on the evidence before it. *See United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995), *cert. denied*, 516 U.S. 1001 (1995) (citing *United States v. Libera*, 989 F.2d 596, 601 (2d Cir. 1993)); *accord Bossett*, 41 F.3d at 830 (it is well settled that "a conviction may be based upon circumstantial evidence and inferences based upon the evidence, and the jury is exclusively responsible for determining a witness's credibility"); *see also Ricco v. Coughlin*, No. 86 Civ. 8245 (MGC), WL 18663, at *5 (S.D.N.Y. Oct. 14, 1987) (circumstantial evidence is sufficient to allow a rational trier of fact to find guilt beyond a reasonable doubt even where there was no eyewitness to the crime.) Dillon failed to show that but for his counsel's unreasonable failure

his trial could have had a different outcome. *Strickland*, 466 U.S. at 694. I recommend that the ineffective assistance of trial counsel claim be **DENIED**.

### 5. Ineffective Assistance of Appellate Counsel

Although the *Strickland* test was formulated in the context of an ineffective assistance of trial counsel claim, this Circuit applies the same two-pronged test to claims of ineffective assistance of appellate counsel. *See Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992). The *Jones* standard establishes that "defense counsel assigned to prosecute an appeal from a criminal conviction" does not have a constitutional duty to raise every non-frivolous issue requested by the defendant." *Jones v. Barnes*, 463 U.S. 745 (1983). Since appellate counsel is not constitutionally compelled to raise a non-frivolous claim even if the defendant instructs him to do so, it is difficult to show that appellate counsel was ineffective for not raising a claim. *Id.* at 751. Dillon "must show a reasonable probability that, but for his counsel's unreasonable failure . . . he would have prevailed on his appeal." *Strickland*, 466 U.S. at 694.

Dillon amended his petition on November 29, 2012, to add a claim of ineffective assistance of appellate counsel. He argues that his appellate counsel deprived him of his Sixth Amendment right to effective assistance of counsel in failing to: 1) argue that Dillon's trial counsel was ineffective; 2) argue that the evidence was factually and legally insufficient; and 3) ask the Appellate Division to decide in the interest of justice whether a circumstantial evidence instruction was required. (Doc. No. 39.)

While the evidence used to convict Dillon was arguably weak, and he may have been entitled to a circumstantial evidence charge, Dillon did not show that a circumstantial evidence charge would have substantially altered his verdict or that unprofessional errors in his counsel's chosen arguments altered the proceeding's result. *See Barnes*, 406 N.E.2d at 1073. He failed to

36

prove that the claims raised by his appellate counsel were substantially weaker than the circumstantial evidence claim. *See Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994; *see also Jones*, 463 U.S. at 745. He also did not prove that but for his appellate counsel's failure to raise on appeal whether a circumstantial evidence instruction was required, he would have succeeded in his appeal. *Strickland*, 466 U.S. at 694. Because trial counsel was not ineffective for failing to request a circumstantial evidence instruction, such a claim raised on appeal by appellate counsel would have been frivolous, and therefore does not amount to ineffective assistance of appellate counsel.

Moreover, because the evidence presented at trial was sufficient to support the findings of the jury, Dillon has not demonstrated that appellate counsel's arguments could have substantially altered the finding by the Appellate Division. As a result, Dillon cannot prove that but for appellate counsel's failure to raise this claim, he would have prevailed on his appeal. *See Strickland*, 466 U.S. at 694. Based on Dillon's failure to establish that appellate counsel was ineffective, I recommend that Dillon's sixth claim be **DENIED**.

### IV.    CONCLUSION

For the reasons articulated above, I recommend that Dillon's petition be **DENIED**.

Pursuant to Rule 72, Federal Rules of Civil Procedure, the Parties shall have fourteen (14) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Andrew L. Carter, Jr., 500 Pearl Street, New York, New York 10007, Room 435, and to the chambers of the undersigned, Room 1970. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the

United States Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. § 636(b)(1) (West Supp. 1995); Fed. R. Civ. P. 72, 6(a), 6(d).

**DATED: December 22, 2015.**
**New York, New York**

        **Respectfully Submitted,**

        **The Honorable Ronald L. Ellis**
        **United States Magistrate Judge**

**MAILED BY CHAMBERS**